STATE OF IOWA, Appellant, v. EXLINE FUEL Co. et al., Defendants, W. H. WELLS, Cross-petitioner, Appellee.

No. 43986.

Nᴏᴠᴇᴍʙᴇʀ 16, 1937.

Rᴇʜᴇᴀʀɪɴɢ Dᴇɴɪᴇᴅ Aᴜɢᴜsᴛ 5, 1938.

John H. Mitchell, Attorney General, E. P. Powers, County Attorney, and Harry F. Garrett, for appellant.

Valentine & Valentine, for appellees, and cross-petitioner.

Rɪᴄʜᴀʀᴅs, J.—Section 8402, Code 1935, is in these words:

"Courts of equity shall have full power, on good cause shown, to dissolve or close up the business of any corporation, and to appoint a receiver therefor, who shall be a resident of the

state of Iowa. An action therefor may be instituted by the attorney general in the name of the state, reserving, however, to the stockholders and creditors all rights now possessed by them.''

Pursuant to this statute, and shortly prior to July 2, 1936, this suit in equity was instituted in the name of the State, to dissolve, and to close up the business of the Exline Fuel Co., an Iowa corporation. Besides the corporation, a number of individuals were made defendants. One of these individuals, W. H. Wells, filed a cross-petition on July 27, 1936, alleging that he held a chattel mortgage upon the property of the corporation. He alleged also the existence of a conditional sales contract in which he had agreed to sell to the corporation the coal mine it operated, and rights under the mining lease of the land on which the mine was located, but with reservation in himself (Wells) of the title to the property and of the possession as security for payment of the purchase price. Both instruments were dated March 13, 1936. In an amendment to the cross-petition filed August 21, 1936, Wells alleged that he had declared to be due the debt secured by the chattel mortgage, and that the unpaid portion of the purchase price named in the conditional sales contract was due on account of default in payment of one of the installments. The prayer in the amendment was that the chattel mortgage and the conditional sales contract be established as first liens on the property and that Wells have judgment against the corporation and the receiver for the amounts shown in said instruments, and that the property be sold and the proceeds applied first upon such judgment. Plaintiff filed answer to the cross-petition and amendment, to which Wells filed reply. On September 30, 1936, the cause proceeded to trial in the district court upon the pleadings and evidence of plaintiff and cross-petitioner. A decree was entered dissolving the corporation, making permanent the temporary receivership that had been previously ordered, directing the manner of closing up the business of the corporation, and also decreeing that by virtue of the chattel mortgage and conditional sales contract the amounts claimed by Wells thereunder were prior and preferred claims against the property of the corporation described in said instruments. The decree ordered foreclosure of both instruments by sale of the property by the receiver. It also was adjudged in the decree that the State of Iowa pay one-

half of the court costs, including cross-petitioner's statutory attorney fees upon the notes secured by the two instruments, in event the proceeds of the sale should be insufficient to pay same. Plaintiff has appealed from the decree.

Appellant urges that the court erred in decreeing that the claims of Wells were secured by first liens because fraud, constructive or actual, inhered in each of the written instruments that purported to afford the security. Appellant says that when Wells procured these instruments he was sustaining a fiduciary relationship to the creditors and stockholders, as an incorporator, director, president, and the one in management of the corporation, and that the obligations and duties of such relationship measure the degree of fair, open, and honest dealing Wells must exhibit in the procuring of the security for his own personal advantage, if the instruments are to be countenanced in a court of equity. This was one of the defenses made by the State in its answer to the cross-petition.

The transactions on which the fraud is said to rest have their beginning in the summer of 1934 when Wells, through foreclosure of a chattel mortgage, acquired the property of an earlier corporation known as the Exline Coal Co. The property so acquired consisted of a coal mine and its equipment, the lessee's interest in the mining lease, and an undivided one-third interest in the lessors' rights to royalties fixed by the terms of the same mining lease. In August or September of 1934 there were negotiations in which Wells and a number of miners, some of them defendants in this action, took part. The reopening and operating of this mine was discussed. Wells offered to accept $1500 for the mine and lease, the amount approximately that he had bid at the foreclosure sale. The price was satisfactory to the miners. Later in 1934 labor was expended and new materials used in preparing the mine for operation. Much of this preliminary labor was donated by the miners. Wells advanced funds for necessary materials and was later reimbursed. The actual mining of coal began toward the end of 1934, and to carry on the project the defendant corporation was formed in January 1935. The articles provided that the general nature of the business of the corporation should be coal mining, etc.; that the business should be cooperative; that the amount of authorized capital stock should be $10,000, divided into 100 shares of $100 each; that the officers should be a president, vice president, sec-

retary and treasurer. Wells was one of the incorporators, and in the articles was named as the president and one of the directors until the first annual meeting of the corporation to be held in April 1935. No annual stockholders' meeting was held, and Wells continued to act as such president and director from the incorporation until the decree of dissolution, and at all times had the general management and direction of the corporation's affairs. Much stressed by appellant are the written contracts that were entered into between the corporation and each miner at the commencement of his employment. In the words of these instruments, each employee "does purchase stock in Mine #1 of the corporation," upon the following terms: The corporation agreed to pay the union wage scale; the employee agreed to have the corporation check off from his wages whatever the board of directors might see fit in the running of business, paying of indebtedness and pay rolls, and upkeep of the property and whatever it might take to carry on the corporation's business, with the limitation that at no time should the check-off exceed 40% of the wages. Each contract also contained an agreement that for every $100 so checked off the corporation would issue to the employee "a stock certificate in the Exline Fuel Company." Under this arrangement with the employees, mining operations were carried on. On March 16, 1936, the amount checked off had reached the sum of $14,768.89. Of this $14,768.89 the portion that had been checked off in full one hundred dollar amounts was $10,900.00. The balance of the $14,768.89 is made up of sums less than $100. No stock of this corporation was issued to any of these employees. No order was made by the executive council permitting capital stock of this corporation be paid for in any other thing than money. Nor was application made for such permission. The record also shows that the corporation was insolvent at the time of and previous to the execution of the chattel mortgage and conditional sales contract.

∎∎∎ From the foregoing it is quite evident that the record sustains appellant's proposition that when Wells procured the two instruments upon which he declares, he, Wells, as an incorporator, director, president, and person having the management and control of the affairs of an insolvent corporation, was occupying a fiduciary relation toward the stockholders and also the creditors. Dawson v. National L. Ins. Co., 176 Iowa 362, 157 N. W. 929, L. R. A. 1916E, 878, Ann. Cas. 1918 B, 230; Wabash

R. Co. v. Iowa & S. W. R Co., 200 Iowa 384, 202 N. W. 595; Hoyt v. Hampe, 206 Iowa 206, 220, 214 N. W. 718, 724, 220 N. W. 45; Clapp v. Wallace, 221 Iowa 672, 266 N. W. 493. A general rule governing the acts of a fiduciary is that he may not, directly or indirectly, appropriate the funds to himself without the concurrence of the cestuis with full knowledge of the facts. Hoyt v. Hampe, supra.

"The policy of the law is to put fiduciaries beyond the reach of temptation, by making it unprofitable for them to yield to it. To that end, an act by a fiduciary in which personal interest and duty conflict, is voidable at the mere option of the beneficiary, regardless of good faith or results." Hoyt v. Hampe, supra.

When the appropriation of assets by the fiduciary is accomplished by procuring execution of mortgage or lien instruments to secure the fiduciary to his personal advantage as a creditor, the policy of law just stated has application if personal interests and duty conflict. In Garrett v. Burlington Plow Co., 70 Iowa 697, 702, 29 N. W. 395, 398, 59 Am. Rep. 461, it is said:

"It is true that the courts will scan with care, and even with suspicion, such transactions, and demand that they be accompanied by the utmost good faith."

Not only is the sustaining of such contracts dependent upon a showing of utmost good faith and fairness but the holding in this jurisdiction is that the burden is on the fiduciary to make the showing. Wabash R. Co. v. Iowa & S. W. R. Co., supra; Hoyt v. Hampe, supra.

▮▮▮ Appellant claims that, in respect to the procuring of the two instruments as security for his own personal advantage, Wells has not sustained the burden just mentioned. In our opinion the record before us is such that this contention must be sustained.

Wells' position was such that his personal interests and his duties as fiduciary conflicted. He elected to serve his personal interests. It is to be noted that the security he obtained was not because of a loan of money or credit made at that time for the benefit of the corporation. Its purpose was to make certain the payment to him of debts previously created. And at the time of the execution of the mortgage and sales contract an assignment

of the bills receivable was also made to Wells, with the result that he was ostensibly placed in position to absorb all the assets of the corporation if needed for payment of his claims. From the record it is very probable that all would be absorbed if all the claims and security of Wells were sustained.

Wells was bound to know the result he was bringing about, in thus serving his personal interests, rather than preserving, as fiduciary, the assets for the creditors and stockholders. That is, it was apparent to him, with his superior knowledge of the affairs of the corporation, that ordinary general creditors, who had dealt at arms length for gain, would largely or wholly be barred from participation in the assets of the corporation. It was equally to be anticipated that, by procuring the security for his own advantage, he was barring the employees who had become creditors, not by dealing with the corporation in the ordinary manner of general creditors, but involuntarily, and as a result of a wrong they had suffered in receiving nothing for the check-off, in which wrong Wells was one of the participants. Law and equity accorded to the employees what they might realize as creditors, as a source of possible recoupment of loss at the hands of wrongdoers. But Wells, though one of the wrongdoers, asserts that he has possessed himself of liens on the assets that are superior to any equitable rights the employee-creditors may have. We will point out here some further matters found in the record, that aid in appraising such assertion.

Appellant says that it affirmatively appears that fairness and good faith did not accompany the execution of the chattel mortgage, in that the note of the corporation secured by the chattel mortgage included a sum of $149.64 not owing to Wells. This $149.64 represented one-third of royalty upon coal mined by the corporation. The point made by appellant is that Wells sold to the corporation all interests he had in the lease including the one-third of the royalty. Examination of the record leads us to that conclusion. Without reviewing all the testimony, it may be said that the recitals in the conditional sales contract made by Wells are that he sold to the corporation all his right, title and interest in and to the lease. In Wood v. Scott, 55 Iowa 114, 116, 7 N. W. 465, 466, we have said:

"The fact that a mortgage is taken for more than is due, from a person known to be insolvent, would, of course, be a

strong circumstance tending to impeach the mortgage, and if it was known to the mortgagee that he was taking a mortgage for more than was due, and no reasonable explanation was given for so doing, it would be difficult, if not impossible, to resist the conclusion that it was taken with a fraudulent intent.''

No explanation of the inclusion of the $149.64 was offered. See, also, Lombard v. Dows & Co., 66 Iowa 243, 23 N. W. 649; Taylor v. Wendling, 66 Iowa 562, 24 N. W. 40.

Another feature has to do with the conditional sales contract. It is the only reasonable deduction from the record that long prior to the execution of this instrument the mine property and lease had been sold by Wells to the corporation and the corporation had been placed in full possession. This is confirmed by Wells' own attitude. He claimed that $1,500 was due him for the mine and lease, and the item was entered on the books of the corporation to his credit. When the entry was made is not shown but the date was so long before the execution of the conditional sales contract that Wells claimed $150 of interest at 8% had accumulated, which was added to the $1,500 resulting in the purported sale price appearing to be $1,650 in the sale contract. In other words, Wells had sold the property and thereafter his rights had long since been those of an unsecured creditor. But into the subsequent conditional sales contract on March 13, 1936, was written the pretense of reservation by Wells of title and possession, although he had neither. Whether the corporation as a party to this contract would be bound by its terms is beside the question. The point and query is whether Wells exercised the utmost good faith and fairness. A representation that he was entitled to a reservation as security of that which he had voluntarily surrendered, unexplained, would seem to point away from utmost good faith.

We are called upon to look into the acts of Wells with far greater scrutiny than we should if he sustained no other relation to this corporation than that of creditor, and we are justified in setting aside the securities he procured upon much slighter ground. Hallam v. Indianola Hotel Co., 56 Iowa 178, 9 N. W. 111. Upon the whole record we are satisfied that Wells has not carried the burden of proving that the utmost good faith accompanied the transactions in connection with the two instruments. The district court should have decreed that neither instrument created a lien.

Our conclusion is necessarily based solely on the record as it appears. It is argued by appellee that the trial court had the opportunity of hearing the evidence first hand and of observing the witnesses, and after considering all such evidence sustained the contentions of Wells. Appellee also says that an examination of the amount of stock to which each witness would have been entitled will reveal that those whose check-offs were heaviest were the ones who stated they believed that Wells should be paid for his mine. Appellee also points out that Wells made no charges excepting for expenses in rendering service to the corporation and says that in fact Wells' incentive was to reopen the mine, furnish employment, and revive the town of Exline. If such was the situation, and if miners were in fact cooperating, and looked upon their rights to stock or reimbursement for labor contributed for stock as a mere matter of form and not of substance, it is unfortunate that the affairs of the corporation were not so conducted that these things could be made to appear in the record upon which we are compelled to determine the issues.

■■■ Appellee contends that the State of Iowa cannot be heard on this appeal. The reason assigned is that section 8402, in an action of this character, reserves "to the stockholders and creditors all rights now possessed by them." Appellee says that because of said reservation the stockholders and creditors were the only parties entitled to make a defense to the cross-petition, and that consequently on this appeal the State of Iowa cannot present for review any adjudication in the court below upon the issues raised solely in the cross-petition. If this be true, the question might arise whether the decree was not rendered in the absence of necessary parties defendant, as it will be noted that the cross-petition and amendment were filed prior to any adjudication upon the dissolution of the corporation, and was tried at the same time with the petition for dissolution, both matters being determined by the same decree. The question whether the State was a proper party to urge the defense, that has already been discussed, could have been raised by motion or other pleading to the answer the State filed. In order that the question be here reviewed it should have been there raised. But instead of so doing, cross-petitioner replied to the answer, joining issue thereon, and thoroughly tried the merits of the defensive matter. Under section 10972 the cross-petitioner could make defendant any person who had or claimed an interest in the controversy

adverse to the cross-petitioner. What cross-petitioner did in substance though not in technical form, by joining issue in the manner stated, was to make plaintiff a defendant to the cross-petition, and to procure a decree that precluded the State to whatever extent the State under section 8402 may have had an interest in the litigation. It may well have been that the cross-petitioner looked upon the State as a defendant claiming a possible interest in the controversy, and sought to have an adjudication against the State to whatever extent the State had an interest. Cross-petitioner procured such adjudication precluding the State upon the question raised in its answer, and incidentally a provisional judgment was rendered against the State for one-half of the court costs including cross-petitioner's attorney fees upon the notes. That the question of plaintiff's right to appear as defendant should have been raised in the trial court finds support in Walker v. Speeder Machinery Corp., 213 Iowa 1134, 1138, 240 N. W. 725, 727, an action under the workmen's compensation laws. A judgment was rendered in the district court against the employer and his liability insurance carrier. On appeal it was claimed there was error in rendering judgment against the insurance carrier because, under the statutes, there was no authority therefor. In the opinion it is stated:

"Nowhere was the question raised that the insurance carrier was not a proper party defendant. The case was tried throughout in behalf of both parties defendant without such objection. Under such a record, the question of jurisdiction over the insurance carrier cannot be raised in this court for the first time. We make no pronouncement as to whether the insurance carrier is a proper or necessary party in such a proceeding."

So far as the provisional judgment against the State was for attorney fees upon notes signed by this corporation it was of course erroneous, and should be expunged. The case is reversed and remanded for proceedings in conformity herewith. —Reversed and remanded.

HAMILTON, C. J., and ANDERSON, PARSONS, DONEGAN, STIGER, KINTZINGER, and SAGER, JJ., concur.

MITCHELL, J., dissents.

MITCHELL, J. (dissenting)—I find myself unable to agree with the majority opinion and therefore respectfully dissent.

The State of Iowa brought this action under section 8402 of the 1935 Code, for the purpose of having a receiver appointed and to dissolve the corporation. The decree that was entered granted all of the relief which the State of Iowa asked for and determined the case in its favor. There was a cross-petition filed by W. H. Wells against certain parties to the action, but not against the State of Iowa. The State of Iowa did file a voluntary answer to the cross-petition, and the case was tried out. Decree was entered in favor of the State of Iowa on its original petition and in favor of W. H. Wells on his cross-petition.

It must be kept in mind that the State of Iowa secured all of the relief it asked for and all of the relief to which it was entitled, by the decree entered. The majority recognize the fact that the State secured all it asked for and all it was possible to get. But they say that the cross-petitioner, Wells, should have filed a motion to strike the answer of the State of Iowa to his cross-petition, and, not having done that, he cannot for the first time raise the question in this court. The answer to that, it seems to me, is that the State of Iowa, by the decree entered on the cross-petition, was not in any way injured or affected except for the amount of costs which might be taxed against the State.

This court has held time and again that it will not entertain an appeal where the only question involved is that of costs. In the case of Hampton v. McKeehan, reported in 187 Iowa 1141, at page 1143, 175 N. W. 5, 6, this court said:

"Appellees have moved a dismissal, one ground of which asserts, in substance, that appellees have removed themselves, and that appellant is at liberty to take possession, without the help of any court. We find this assertion in the motion to be true. It is, therefore, our opinion that a consideration and decision of this appeal will effect nothing, except to settle who shall pay costs. We cannot decide the appeal when nothing but that will be accomplished by the decision. Moller v. Gottsch, 107 Iowa 238, 77 N. W. 859; Young v. Olson (Iowa), 115 N. W. 1020; Kelley v. Kelley, 187 Iowa 349, 174 N. W. 342. See, also, State v. Richmond & D. R. Co., 74 N. C. 287; State v. Loomis (Tex.), 29 S. W. 415; 2 Century Digest, sections 63 to 84; 3 Century Digest, section 3122."

The decree of the lower court having granted the State of Iowa all of the relief it sought, and the State having no interest in this appeal except as to the question of costs, it should not be permitted to maintain the appeal.

The other question involved is that of fraud. I have gone over this record. It appears that Wells had secured title to the mine involved in this case. There was no employment for the miners of the locality and so an arrangement was entered into, in writing, whereby the miners were to work at the going wage and a part of their earnings was to be withheld and stock in the corporation was to be issued for the amount of wages not paid. The amount that Wells was to receive for the mine was agreed upon. The theory of the defense is that Wells was guilty of fraud, and that representations were made to the miners to secure their signatures to the contract, that when the amount checked off from the wages due them had reached the sum of $10,000 the mine would be theirs. The record is an exceedingly interesting one. Only one witness (and there were some fifteen or eighteen) testified that Wells made any direct statement to him, and all he testified was that Wells said it was a good mine and they simply owed $2700. Not a single witness testified that he signed the agreement upon any representations directly made by Wells. There are two or three witnesses who testified that Wells was present when other officers and directors of the company made statements in regard to the financial condition of the company, and they claimed Wells sat by and made no objections to these statements. It is very doubtful if any of the statements were admissible. There was a written contract entered into by these miners. The statements which they claim to have been made by other officers and directors are not very specific, but Wells made none of them, and, to charge him with fraud in face of his failure to make any statements, and simply because he sat by and listened while some officer or director was alleged to have made a fraudulent statement (and there is no proof that it was fraudulent), it seems to me is entirely out of line with the requirements of proof of fraud that this court has laid down in other cases. There was a large number of witnesses. The distinguished and able trial court had the opportunity of listening to them. He did listen and then entered the decree in favor of the cross-petitioner. I think he was right, and I would affirm the decision of the lower court.